MEG/AS
F.#2017R01721

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**18M 708**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF APPLE IPHONE 8, SIM CARD 8901260933 758637548 IN THE CUSTODY OF THE FEDERAL BUREAU OF INVESTIGATION | APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>Case No. _____ |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, STEVEN SCHILIRO, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2009.  I am currently assigned to the New York Metro Safe Street Gang Task Force, where I investigate gangs, narcotics trafficking, firearms trafficking, fraud and other offenses.  These investigations are conducted both overtly and covertly.  During my tenure with the FBI, I have participated in numerous investigations of gangs, during which I have (a) conducted physical surveillance, (b) executed search warrants, (c) debriefed

cooperating witnesses and victims, (d) reviewed and analyzed numerous taped conversations

of those engaged in gang activities, (e) monitored wiretapped conversations and reviewed

line sheets prepared by wiretap monitors, and (f) reviewed material obtained pursuant to

search warrants, including the contents of electronic devices, electronic mail accounts and

social media accounts. Through my training, education and experience, I have become

familiar with the manner in which racketeering, drug distribution, gun trafficking and money

laundering schemes are carried out, and the efforts of persons involved in such activity to

avoid detection by law enforcement.

2.      This affidavit is intended to show only that there is sufficient probable cause

for the requested warrant and does not set forth all of my knowledge about this matter.

## **IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

3.      The property to be searched is an Apple iPhone 8, Sim Card 8901260933

758637548, hereinafter the "Device." The Device has been in the custody of the FBI since it

was seized on April 17, 2018. The Device is currently in the Eastern District of New York in

the custody of the undersigned, but it is generally maintained in storage at the FBI's New

York Field Office under item number 1B9 and barcode E6280664.

4.      The applied-for warrant would authorize the forensic examination of the

Device for the purpose of identifying electronically stored data particularly described in

Attachment B.

2

## **PROBABLE CAUSE**

5.      The Device came into the custody of the FBI on April 17, 2018, when Lavon

Barrett, also known as "Stunna" ("BARRETT"), the user of the Device, was arrested

pursuant to a warrant issued by the Honorable Ramon E. Reyes, Jr., Magistrate Judge for the

Eastern District of New York.  BARRETT was arrested in his vehicle in the Bronx.  The

Device was located on the passenger seat.  The arrest warrant was predicated on

BARRETT's membership in a large-scale narcotics-trafficking conspiracy operating in

Brooklyn, the Bronx, and elsewhere.  BARRETT is charged under criminal docket 18-185

(FB) with Conspiracy to Distribute and Possession with Intent to Distribute cocaine base and

heroin, in violation of Title 21, United States Code, Section 846 and 841(b)(1)(A)(iii).

6.      Prior to his arrest, BARRETT was the target of a long-term investigation

conducted by the FBI and the New York City Police Department ("NYPD") into drug-related

and other crimes committed by members of the Mac Baller Brims, a set of the Bloods street

gang in which BARRETT is a member.  The investigation involved, among other

investigative techniques, the use of Court-authorized wiretaps, including one of the Device.

The Honorable George B. Daniels, U.S. District Court Judge for the Southern District of

New York, authorized the interception of wire and electronic communications over the

Device on February 9, 2018.  On March 22, 2018, the Honorable Gregory H. Woods, U.S.

District Court Judge for the Southern District of New York, renewed authorization to intercept wire and electronic communications over the Device.[1]

7.      Communications intercepted between February 9 and April 17 pursuant to the court Orders described above demonstrate that BARRETT routinely used the Device to facilitate drug- and gang-related activity.  More generally, the investigation revealed that BARRETT sold drugs and that he held a position of leadership in the gang.

8.      On March 31, 2018, BARRETT used the Device to speak to Felix Collazo, also known as "Broadway" ("COLLAZO"), another member of the gang and the drug-trafficking conspiracy (session #1521).  The conversation between the two men demonstrated BARRETT's position of authority in the gang, as well as the fact that members of the gang engage in criminal activity to earn money for the gang.  During the call, the following exchange occurred:

COLLAZO:  Hey yo, Live called me yesterday, told me to give CK the low, told me to give the nigga CK the low for the Bronx, so CK got the low, I tried to call you yesterday.
                            ***
BARRETT:  I don't know, he say he was gonna talk to me in person, but that nigga ain't moving right.
COLLAZO:  Hell yeah, Sleeze, we ain't got time for none of these niggas, niggas.
BARRETT:  That nigga ain't getting nothing bro, I don't care what Live says bro.
COLLAZO:  Right, right, you absolutely right.
BARRETT:  I'm getting tired of like, I ain't gonna disrespect none of the Dons behind the wall, but these niggas is always spinning some nigga to do some shit out here, and niggas be clowns, bro.

---

[1] I am informed that the Device is the cellular telephone that was the subject of the wiretaps Orders described herein because on April 17, 2018, a member of law enforcement dialed the telephone number that was the subject of the wiretap Orders and the Device rang.

COLLAZO:  Yeah, I ain't gonna lie, you ain't never lie about that.
BARRETT:  There are too many chiefs behind the wall making too many calls for
          niggas, like this is our side. Y'all take care of that shit right there.
          Y'all put us her for a reason. Let us take care of it.
                                    ***

BARRETT:  Yeah, I spoke to CK yesterday.
COLLAZO:  Yeah, I spoke to him yesterday too. I don't know what's special about
          him, but hey, maybe he'll generate something for us, you feel me?
BARRETT:  That's what he said, he said something about bringing something to the
          table. Then after he told me all that, he like yo, the bro Live said I sit
          here. So I said many, you sit nowhere yet. I'll talk to you when I see
          you in person, know what I mean?

I believe that in this call BARRETT and COLLAZO were discussing the fact that Live told

COLLAZO to give CK the position of "low stain" in the Bronx set of the Mac Baller Brims

("give the nigga CK the low for the Bronx"). I am aware that "low stain" is a position of

authority in the hierarchy of the Bloods street gang, and that it falls below the "high stain." I

am further informed that "behind the wall" is a commonly used slang term for gang members

who are incarcerated, and I therefore believe that BARRETT and COLLAZO were

complaining that incarcerated gang members ("Dons behind the wall") are giving too many

orders to gang members in the streets and it is causing problems.

        9.      This call also provides evidence of BARRETT's and COLLAZO's possession

of firearms, and that the gang employs acts of violence to protect its interests. Later in the

call, COLLAZO told BARRETT "I need that food ASAP though, I gotta take care of

something. I need that food ASAP, ASAP, ASAP. Word, I ain't gonna lie, you ain't think

you can get it?" BARRETT responded, "Well, this what you do. Start working on getting

some food as well, if I gotta give you the food out of my shit, you got a 38th Street, right?

With the zero on the back?" COLLAZO responded, "yeah," to which BARRETT stated, "I

got six dollars in my shit." COLLAZO protested: "Yeah, nah, you gonna need that though" and BARRETT replied, "But if you gotta go take care of something, then nigga, you gotta go take care of it." I believe that, in this context, "food" was a coded word for bullets. I further believe that BARRETT was confirming that COLLAZO had a .380 caliber firearm when he asked, "you got a 38th Street, right? With the zero on the back?" and that BARRETT was reporting that he had six .380 caliber bullets in his firearm ("give you the food out of my shit" and "I got six dollars in my shit"). That COLLAZO was contemplating an act of gang-related violence is apparent from the end of the call where COLLAZO stated, "some nigga from Clay tried to cut the Mac yesterday. I went there and he ain't really, wasn't no static, but I'm done with this. You trying to move on the Macs, so I'ma make a, make a statement. Right. Can't fuck with the Macs like that, heard me? Shit is real heard me? Niggas'll die for this shit, right for this shit, and let it fly for this shit."

10.    On April 6, 2018, BARRETT asked an unidentified male using telephone number (929) 385-5430 (the "5430 User") (5596), "yo, I got some sour 24 bro . . . how long it gonna take you to move it?" The 5430 User reported, "I can move that within a day and a half . . . but it gotta be the hit though." BARRETT assured him it was and said he'd call back. I am aware that "sour" is a high-quality strand of marijuana. Approximately twenty minutes later, BARRETT texted COLLAZO "Sour 180 a zip." Similarly, on April 9, 2018, BARRETT texted telephone number (720) 597-8114, "Got that fire sour," (6248) and "100 half 200 zip" (6248), which reveals that he was seeking to sell marijuana ["sour"] that he had in his possession.

11.    BARRETT also engaged in a drug-related conversation with Kevin St. Hill,

6

another member of the gang and the drug-trafficking conspiracy, on April 8, 2018 (6069).

| | |
|---|---|
| BARRETT: | Yo, that baller situation that shit looking good right now. |
| ST. HILL: | Oh yeah? |
| ST. HILL: | What his [UI] at? |
| BARRETT: | 19 |
| ST. HILL: | That's a good number. |
| BARRETT: | That shit dope. |
| ST. HILL: | Fire? |
| BARRETT: | Hell yeah. |
| ST. HILL: | I haven't seen a good number.  A half a joint like what? |
| BARRETT: | Um, a half of 19, what's that . . . that's 950. |

I believe that this call pertains to drugs, a "whole joint" of which sells for $1900. My belief is based on the investigation, but also the fact that BARRETT described the item for sale as "fire," which is a commonly used term to indicate the high-quality of drugs.

12.     . Intercepted communications revealed that BARRETT engaged in a bank fraud scheme, along with other members of the drug-trafficking conspiracy and Deshawn Pinney ("PINNEY"). A call intercepted on April 4, 2018, reveals that BARRETT worked to perpetuate the fraud by referring people to PINNEY. In the call (5416), "Sin City" from South Carolina told BARRETT, "[UI] told me to holla at you about the credit shit. Cause I am trying to get my credit score together and shit." BARRETT responded, "Alright, so listen. Never miss no payment. I'm going to holla at my man today and let him know I got somebody. And you need to create a Credit Karma. A login. A Credit Karma login. And you are going to have send me your NYS ID and your social security card." Previously intercepted communications reveal that PINNEY manipulates people's credit score and takes a portion of the money they acquire from the cash advances they apply for and receive as a result.

7

13.     The calls and text messages detailed herein are a small sampling of the drug- and gang-related communications intercepted over the Device during the authorized interception period.  The Device is currently in the lawful possession of the FBI and has been since it was seized incident to the arrest of BARRETT.  Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

14.     The Device is currently in the Eastern District of New York in the custody of the undersigned, but it is generally maintained in storage at the FBI's New York Field Office under item number 1B9 and barcode E6280664.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

**TECHNICAL TERMS**

15.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually

8

contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

9

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically

10

calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with

11

those functions.  Apps can, for example, permit accessing the Web, sending
and receiving e-mail, and participating in Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to contact an
individual through an alert, or a numeric or text message sent over a
telecommunications network.  Some pagers enable the user to send, as well as
receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique
numeric address used by computers on the Internet.  An IP address is a series
of four numbers, each in the range 0-255, separated by periods (e.g.,
121.56.97.178).  Every computer attached to the Internet computer must be
assigned an IP address so that Internet traffic sent from and directed to that
computer may be directed properly from its source to its destination.  Most
Internet service providers control a range of IP addresses.  Some computers
have static—that is, long-term—IP addresses, while other computers have
dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic
devices that communicate with each other.  Due to the structure of the Internet,
connections between devices on the Internet often cross state and international
borders, even when the devices communicating with each other are in the
same state.

12

16.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.apple.com/iphone-8/?afid=p238%7CFb5CZhV4-dc_mtid_20925d2q39172_pcrid_78477675841120_&cid=wwa-us-kwbi-iphone-slid--, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

18.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted

13

portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

14

19.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

20.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

15

## CONCLUSION

21.    I submit that this affidavit supports probable cause for a search warrant

authorizing the examination of the Device described in Attachment A to seek the items

described in Attachment B.

Respectfully submitted,

Steven Schiliro
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on July 31, 2018:

The Honorable Marilyn D. Go
UNITED STATES MAGISTRATE JUDGE

16

## **ATTACHMENT A**

The property to be searched is an Apple iPhone 8, Sim Card 8901260933 758637548, hereinafter the "Device." The Device is in the custody of the Federal Bureau of Investigation ("FBI") and is being stored in the New York Field Office under item number 1B9 and barcode E6280664, except that it was removed from storage and transported to the Eastern District of New York by a Special Agent of the FBI on July 31, 2018 for the purpose of seeking this warrant.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to

violations of including  racketeering and racketeering conspiracy, in violation of 18 U.S.C.

§§ 1962(c) and (d), and punishable under 18 U.S.C. § 1963, drug trafficking, in violation of

21 U.S.C. §§ 841, 843, and 846, and firearms-related offenses, in violation of 18 U.S.C.

§§ 922 and 924, bank fraud, in violation of 18 U.S.C. § 1344 and involve Lavon Barrett, also

known "Stunna" ("BARRETT"), since January 2017, including:

     a.  lists of customers and related identifying information;

     b.  types, amounts, and prices of drugs trafficked as well as dates, places, and
        amounts of specific transactions;

     c.  any information related to sources of drugs (including names, addresses, phone
        numbers, or any other identifying information);

     d.  any information related to individuals who work with or for RABB to
        distribute drugs (including names, addresses, phone number, or any other
        identifying information);

     e.  all bank records, checks, credit card bills, account information, and other
        financial records;

     f.  evidence of the use, possession and/or sale of firearms;

     g.  any information demonstrating RABB's membership in the Bloods street
        gang, and the Mac Baller Brims; and

      h.  any information related to other individuals who are members in the Bloods street gang, and the Mac Baller Brims (including names, addresses, phone number, or any other identifying information);

2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

2